**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CIVIL ACTION NO. 08-11**

**RICK O'BRYAN,**                                                                     **PLAINTIFF,**

**V.**                           **MEMORANDUM OPINION AND ORDER**

**CONSOL ENERGY, INC. , AND**
**LIBERTY LIFE ASSURANCE COMPANY**
**OF BOSTON,**                                                                      **DEFENDANTS.**

* * * * * * * * * *

This matter is before the court on the plaintiff's motion for summary

judgment to reverse an administrative decision.  R. 28.  For the reasons discussed

below, the court will deny the motion.

**I.     Background**

Claimant Rick O'Bryan was employed as a foreman by CONSOL Energy, Inc.

("Consol") from November 1, 1990, until his employment was terminated on June

2, 2005.  O'Bryan was a participant in and covered by a long-term disability

("LTD") benefits plan (the "Plan") governed by the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.  Consol administers the Plan

and Liberty Life Assurance Company of Boston ("Liberty") serves as the third-party

administrator.  This dispute arises from the termination of O'Bryan's benefits under

the Plan.

O'Bryan alleges that he became disabled on or about March 8, 2004. Compl. 2, ¶ 7.[1]  He filed a claim for benefits with the defendants and received short-term disability benefits, also known as salary continuance plan benefits, between March 9 and April 4, 2004,[2] and again from June 29, 2004, to June 2, 2005.  This period constituted his twelve-month Qualifying Total Disability Period, the first of three time periods relevant to the determination of benefits under the Plan.  Under the terms of the Plan, the criteria for Totally Disability are as follows:

> During the first 12 months of your Total Disability following the 12-month Qualifying Total Disability Period, you must be unable to perform the material and substantial duties of your regular occupation or any reasonable alternative offered by the Company, and you must at no time engage in any occupation or employment for pay or profit.  These inabilities must be due to the Total Disability which you had during the Qualifying Disability Period.

> After the first 24 months of your Total Disability (all time you spend completing the Qualifying Total Disability Period will count in the 24 months) you must be completely unable to engage in any Suitable Employment.  Your Total Disability must be the same Total Disability which you had during the Qualifying Disability Period.

R. 28, Ex. 1, at 19.

On August 30, 2005, after his Qualifying Total Disability Period, an evaluation by Dr. Schroeder (AR 389-391), and a file review by Dr. Amy Hopkins at

---

[1]Defendants claim that O'Bryan's alleged disability began on June 3, 2004 (R. 29 at 2), but a letter from Liberty states, "We have determined you[r] date of disability as March 8, 2004" (AR 365).

[2]Plaintiff alleges that short-term disability benefits were paid beginning on or about March 9, 2004, through April 4, 2004 (Compl. 2, ¶ 7), although the defendants contend that short-term disability payments were paid between March 9 and March 23, 2004, and again from March 29 to April 4, 2004 (R. 4, 2).

Liberty's request (AR 502-06), O'Bryan's claim for LTD benefits was approved

under the "Limitations for Mental Illness" provision of the Plan[3] (AR 364-65).  *See*

AR 502 (concluding that "it is more likely that there is a primarily *psychological*

basis for the claimant's symptoms rather than a *physical* disorder") (emphasis

added).  Benefits were paid for the period commencing June 3, 2005.  LTD

benefits under the Mental Illness provision of the Plan are paid for a maximum of

twelve months (R. 28, Ex. 1, at 11-12), unlike LTD benefits for physical disabilities,

which can be paid until an employee reaches age sixty-five (R. 28, Ex. 1, at 8).

On January 12, 2006, after Dr. Hopkins completed a second file review (AR

348-51), Liberty sent O'Bryan a letter stating he had "no physical impairments

established by physical examinations or diagnostic testing" (AR 319).  On February

28, 2006, Liberty sought more information from O'Bryan's physicians regarding his

eligibility for ongoing disability benefits.  AR 293, 298, 301, 303.  On May 11,

2006, near the end of the one-year limitation period for disability payments for

Mental Illness, Liberty notified O'Bryan's attorney that LTD benefits would be paid

--------------------------------------------------

[3]That provision states: "If Mental Illness is the primary cause or a
contributing cause of your Total Disability based on any one or more of the
conditions listed below, the Company will pay monthly benefits under this Plan on a
limited basis.  Once a maximum of 12 monthly Long Term Disability benefit
payments have been paid, no future benefits will be payable for any of the
following conditions, if they are a primary or contributing cause of your Total
Disability: Mood and Anxiety disorders; Delusional (paranoid) disorders; Depressive
disorders; Eating disorders; Mental illness that results from any cause or any
condition that may result from mental illness; or Somatoform disorders
(psychosomatic illness).  No benefits are payable for any time that you are not
Totally Disabled."  R. 28, Ex. 1, at 11-12.

3

under a reservation of rights while Liberty continued reviewing his claim.  AR 254.

Such payments were made until Liberty terminated O'Bryan's LTD benefits on

October 16, 2006, because there was insufficient medical evidence, even after an

Independent Medical Evaluation (IME) by Dr. Terry Troutt (AR 224-33), supporting

O'Bryan's claim of physical restrictions or limitations such that he satisfied the

Plan's definition of disability and was unable to engage in any Suitable Employment.

AR 177-80.  In the termination letter, Liberty also noted the fact that O'Bryan had

not completed a four-week work hardening conditioning program as recommended

by Dr. Troutt.[4]  AR 179.

 Conversely, the Social Security Administration (SSA) determined that

O'Bryan was disabled and awarded him disability benefits on November 14, 2006.

AR 150-59.  In mid-April 2007, as part of O'Bryan's appeal of the termination of

his LTD benefits payments, he provided notice of the SSA award and additional

medical evidence supporting his alleged physical disability.  AR 146-49.  O'Bryan

also sent checks to Liberty totaling $37,040.04 on May 4, 2007, for the Social

Security offset.  AR 52.  As part of the appeals process, Liberty engaged Dr.

Thomas Lazoff to produce an independent peer review report (AR 117-27), which

was used as the basis of a Transferable Skills Analysis conducted by a vocational

---

 [4]Dr. Troutt noted that O'Bryan was in a "deconditioned state," at the time he examined him.  AR 209.  However, if O'Bryan completed a four-week work conditioning program, Dr. Troutt expected O'Bryan's condition to improve such that the restrictions Dr. Troutt imposed would be unnecessary and O'Bryan would be physically able to participate in his "prior level of occupation."  *Id.*

case manager at Liberty on June 35, 2007 (AR 114-15).  Based on Dr. Lazoff's

conclusions, including that "there is no supportive impairment that would translate

into any specific physical restrictions and/or limitations," (AR 125) and the

identification of alternative occupations that were compatible with O'Bryan's

transferable skills, abilities, knowledge, and physical capacities for work (AR 115),

the defendants upheld their decision to terminate his LTD benefits on July 11,

2007 (AR 107-12).  Defendants maintain "[t]here was no conclusive medical

evidence that Plaintiff was completely unable to engage in Suitable Employment, as

required by the Plan."  R. 29, at 1.

Having exhausted his administrative remedies, O'Bryan filed suit, seeking full

contractual benefits to which he believes he is entitled, including severance

benefits, salary continuance benefits, attorneys' fees, interest, and damages.

## II.    Legal Analysis

### A.    Long-Term Disability Benefits

The parties agree that the Plan gives the defendants discretionary authority

to determine eligibility for benefits.  Accordingly, this court must apply the "highly

deferential arbitrary and capricious standard of review."  *Evans v. Unumprovident

Corp.*, 434 F.3d 866, 875–76 (6th Cir. 2006) (quoting *Killian v. Healthsource

Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998)).  Under this standard,

the defendant's decision to terminate plaintiff's LTD benefits will be upheld if "it is

the result of a deliberate principled reasoning process, and if it is supported by

substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)

(quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d

1140, 1144 (6th Cir. 1991)).  This review of the benefit denial takes into account

several factors, including the defendants' consideration of the SSA's disability

determination, Consol's inherent conflict of interest, and the quality and quantity of

medical evidence and opinions considered in the denial of O'Bryan's benefits.  *See*

*DeLisle v. Sun Life Assurance Co. of Can.,* 558 F.3d 440, 444 (6th Cir. 2008).  On

balance, the defendants' decision was "rational in light of the plan's provisions, and

thus not arbitrary or capricious." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th

Cir. 1988).

> i.    The SSA Disability Determination

Although the defendant administrators are not bound by the SSA's decision

that O'Bryan is disabled, it is "far from meaningless." *Calvert v. Firstar Fin., Inc.*,

409 F,3d 286, 294 (6th Cir. 2005).  One reason the two disability determinations

may differ is that the disability criteria under the Plan and the Social Security Act

differ.  Additionally, the SSA, unlike ERISA administrators, must defer to the

opinions of treating physicians, if there is objective support for those opinions in the

record.  *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir.

1990).  "[T]he SSA determination, at a minimum, provides support for the

conclusion that an administrative agency charged with examining [O'Bryan's]

medical records found, as it expressly said it did, objective support for [O'Bryan's

6

doctors'] opinion[s] in those records." *Calvert*, 409 F.3d at 294.

This court should consider the fact that the defendants required O'Bryan to apply for other sources of benefits, including Social Security (R. 28, Ex. 1, at 10); received the bulk of the benefits of his success in doing so (*see* "Overpayment File," AR 49-101); and then deemed O'Bryan not disabled. *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2352 (2008) (noting that this was an important factor and that the conflicting disability decisions further suggested procedural unreasonableness).  It is unclear whether O'Bryan submitted only notice of his Social Security award (R. 28, at 23) or the full decision (R. 29, at 8) to the defendants. *See DeLisle*, 558 F.3d at 450 (Batchelder, J. dissenting) (pointing out that because the plaintiff submitted only the SSA's *conclusion* that she was disabled, it was difficult for the administrator to give it due consideration).  Either way, the defendants addressed the contrary SSA decision. *Cf. Calvert*, 409 F.3d at 290.

Dr. Lazoff was the only physician who peer-reviewed O'Bryan's medical records after the SSA determined that he was disabled, but it does not appear that Dr. Lazoff knew of that decision when he conducted the review.  AR 118.  Consol acknowledged briefly in its final denial letter the SSA's favorable disability determination, and distinguished its own, opposite conclusion on the basis of "IME and peer review documentation, vocational analysis, and activity observations that were not considered by the SSA in its determination process."  AR 111.  The

7

defendants' failure to explain more fully why they took a position different from the SSA's is not arbitrary per se, but it can be a factor in finding that Consol and Liberty abused their discretion.  *See DeLisle*, 558 F.3d at 446.  Taken together, this course of events weighs in favor of a finding that the defendants' decision was arbitrary and capricious.  *Id.*

### ii.    Conflict of Interest

Consol's[5] dual role of determining whether an employee is eligible for benefits and paying benefits out of its own pocket creates a conflict of interest, although it should not be given substantial weight in this particular analysis.  *Metro. Life*, 128 S.Ct. at 2346 (noting the significance of the conflict varies from case to case).  The present situation is unique in that it is a combination of the two conflict situations envisioned by the Supreme Court in *Metropolitan Life Insurance Company v. Glenn*: (1) when an employer both funds and evaluates benefits claims and there is clearly a conflict, and (2) when the plan administrator is a professional insurance company, and the conflict question is less clear.  128 S.Ct. at 2348-49.

Here, Consol is the employer/administrator, but Liberty, a professional insurance company, serves as a third-party administrator.  Consol's own conflict may extend to its selection of an insurance company like Liberty to administer its plan.  *Id.* at 2349-50.  That said, the defendants have taken active steps to reduce

---

[5]This court has previously determined that Liberty did not have an inherent structural conflict, as it "evaluates claims but does not pay benefits out if its own funds."  R. 20, at 6.

potential biases and prejudice, a means suggested by the Supreme Court in
*Metropolitan Life* to assuage conflicts of interest.  128 S.Ct. at 2351.  For
example, Liberty makes the initial disability review and recommends to Consol a
decision on each case, and does the same for administrative appeals.  R. 29, at 12.
The defendants also contend that financial inducements exist for Liberty to grant
claims, not to deny them.  R. 29, at 11-12 (pointing out that "Liberty charges
CONSOL administration fees based upon the number of open claims it
administers").  As proof of the "success" of such measures, Consol alleges, and
the plaintiff does not refute, that it has never overturned a decision by Liberty to
award benefits, and has only occasionally reversed a recommendation from Liberty
to deny benefits.  R. 29, Ex. D, Defs.'s Answers to Pl.'s Interrog. No. 6, at 4.

The plaintiff insinuates that because Consol hired Liberty, Liberty must have
incentives to deny claims.  R. 28, at 20.  O'Bryan attempts to demonstrate that
Consol's decision to engage Liberty was financially motivated by proffering
personnel records stating that Consol selected Liberty as a third-party administrator
because "we are going to get better service at a lower cost."  R. 28, Ex. 2, at 24.
This comment does not demonstrate that claims-handling accuracy was sacrificed
when Consol selected Liberty, just that Consol sought a competitive price.  *See*
*Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998).  Without more,
O'Bryan's conclusory allegations of bias are insufficient to carry his burden of
demonstrating the defendants' denial was arbitrary and capricious.  *Tracy v.*

9

*Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006).

More weight should be given to the conflict of interest "where circumstances suggest a higher likelihood that it affected the benefits decision," but there is no such suggestion here. *Metro. Life*, 128 S. Ct. at 2351 (providing an example of an insurance company administrator that has history of biased claims administration as a conflict of interest that would be a more important factor in a court's analysis). Despite two grants from this court of additional limited discovery (R. 14, 20), O'Bryan has not demonstrated that the conflict between Liberty and Consol actually motivated the defendants' denial of benefits in this case or any other. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). Nor is there any evidence that the defendants attempted to tamper with or influence the consulting physicians' opinions. *See Kalish v. Liberty Mutual/Liberty Life Assurance*, 419 F.3d 501, 507 (6th Cir. 2005); *Calvert*, 409 F.3d at 292 (pointing out that where an employer/administrator serves a dual role, it has a "clear incentive" to employ consulting physicians who are "inclined to find" that employees are not entitled to benefits).

While the presence of a conflict is a factor to be considered when determining whether Consol abused its discretion by denying benefits in this particular case, *Id.* at 2349 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)), O'Bryan has failed to show how any conflict of interest

caused the defendants to engage in an unreasoned decision-making process.  *See DeLisle*, 558 F.3d at 450; *Rose*, 268 F. App'x at 450 (noting the existence of the conflict alone does not render the defendants' denial arbitrary and capricious).

### iii.    Medical Evidence

"A court's review for arbitrary and capricious decision-making 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'"  *DeLisle*, 558 F.3d at 446 (quoting *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  O'Bryan specifically challenges the defendants' denial of his LTD claim based on the lack of conclusive medical evidence that he was unable to engage in Suitable Employment, but the defendants' position was based on a comprehensive review of O'Bryan's medical records.

Throughout the course of his disability, O'Bryan was treated by multiple health care providers including Drs. Raymond, an interventional cardiologist; Twyman, a neurologist; Shojaei and Kohli, rheumotologists; Carr, an internist; Grider, a pain-management specialist; Bosomsworth, an anesthesiologist and pain-management specialist; and Shropshire, a therapist.  While multiple providers diagnosed O'Bryan with fibromyalgia, a mere diagnosis does not necessarily satisfy the requisite disability showing under the terms of the Plan: that O'Bryan is "unable to perform the material and substantial duties of [his] regular occupation" and "completely unable to engage in any Suitable Employment."  R. 28, Ex. 1, at 19.

Only two physicians asserted that O'Bryan was disabled as a result of his condition.  Dr. Carr, his primary physician, repeatedly affirmed throughout the claims process his belief that O'Bryan was disabled (AR 169, 171, 173, 262, 263, 264, 342-43, 429) and could "never" return to work (AR 340, 589), but provided scant objective evidence to support that opinion.  Dr. Grider diagnosed "disabling myalgias."  AR 449.  O'Bryan complains that the defendants ignored these opinions provided by his treating physicians, and instead denied his benefits based on "opinions of physicians that were hired and paid by the Defendants."  R. 28, at 21. But plan administrators like Consol and Liberty "are not obligated to accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

Nor must administrators explain why they credit "reliable evidence that conflicts with a treating physician's evaluation," *id.* at 834, although the defendants justified their decisions to rely mostly on three consistent reviewing doctors' opinions.  "If a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"  *Nord*, 538 U.S. at 832.  Because Dr. Carr explicitly expressed his willingness to serve as O'Bryan's advocate in the claims process, the defendants reasonably questioned his objectivity.  *See e.g.*, AR 173 (stating in a letter to O'Bryan's Disability Case manager at liberty that he "will support [O'Bryan] in a case against you"); AR 263 (noting communication with O'Bryan's attorney

12

and that "I have told him that I fully support his efforts of disability").

Because the symptoms of fibromyalgia are "largely subjective," *Huffaker v. Metro. Life. Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008), it would be difficult for O'Bryan to produce objective evidence of the condition. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 915-16 (7th Cir. 2003) (noting fibromyalgia is "a common, but elusive and mysterious, disease . . . and, of greatest importance to disability law, its symptoms are entirely subjective"). "There are no laboratory tests for the presence or severity" of fibromyalgia. *Id.* It is reasonable, however, for the defendants to require objective evidence of how O'Bryan's functional capacity is affected by his fibromyalgia. *Rose v. Hartford Fin. Servs. Group, Inc.*, 268 F. App'x 444, 453 (6th Cir. 2008); *see also Pralutsky v. Metro. Life. Ins. Co.*, 435 F.3d 833, 840 (8th Cir. 2006) (holding that because fibromyalgia has a varying impact on people, it was permissible for the administrator to ask for objective evidence of how it afflicted the claimant to the point she could not perform any work).

The defendants did not act arbitrarily and capriciously in requiring objective evidence based on the Plan's language. In *Huffaker*, the Sixth Circuit found that a plan's standard that a claimant is "unable to perform each of the material duties of [his] occupation" could be interpreted to require objective evidence of the claimant's physically disabling condition. 271 F. App'x at 500. Here too, the Plan's language that "you must be unable to perform the material and substantial

13

duties of your regular occupation or any reasonable alternative" and "you must be completely unable to engage in any Suitable Employment" could be interpreted to require objective proof of O'Bryan's disability. *See also Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007) (holding that objective-evidence-of-disability requirement was not irrational or unreasonable where definition of "disability" required proof of inability to perform "all the material duties of his or her Regular Occupation"). There is also a clause in the Plan that explicitly requires all claims for total disability to be supported by "up-to-date conclusive medical evidence," which O'Bryan did not satisfy. R. 28, Ex. 1, at 10.

It was further reasonable for the defendants to expect substantiation of the extent of O'Bryan's disability because they notified O'Bryan and his physicians on multiple occasions that his file lacked such support. *Pralutsky*, 435 F.3d at 838-40. To be clear, the defendants fairly required objective evidence of how fibromyalgia and O'Bryan's other alleged maladies restricted and limited his physical ability to work, and denied O'Bryan's claim for the lack of such evidence. *Id.* at 453-54 ("While the diagnos[is] of . . . fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such illness[ ] do lend themselves to objective analysis.") (citing *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003)).

O'Bryan argues that, although other evidence of his disability should be considered, sufficient objective evidence exists that he is completely unable to

14

engage in any Suitable Employment.  He points to a series of lab tests ordered by

Dr. Twyman that O'Bryan asserts rules out a diagnosis other than fibromyalgia with

chronic pain.  AR 567, 569, and 571-72.  O'Bryan also cites other objective

evidence of his condition, including progressively worse MRIs which showed

degenerative changes at C5-6 with a bone spur rubbing on the nerve root (AR 568);

broad disc protrusion at C5-6 (AR 458); degenerative disc disease at C5-6,

posterior spurring and disc protrusion, and mid central spinal stenosis (AR 428);

and degenerative changes in the cervical region (268).  His challenge to the

administrator's denial also relies heavily on the fact that rheumatologist Dr. Manoj

Kohli twice found 18 of 18 fibromyalgia tender points, although the two

consultations occurred during a two-and-a-half-week period.  AR. 424, 426.

Dr. Carr did complete a "Restrictions Form" provided by Liberty, on which he

stated that O'Bryan could never return to work because of his medical condition

and mentioned that O'Bryan's regimen of pain medications was not successfully

managing O'Bryan's pain.  AR 589.  Even so, Dr. Hopkins, who is board-certified in

Internal Medicine and Occupational & Environmental Medicine, noted that "testing

and examinations have not supported the presence of any physiological disorders to

explain the claimant's many symptoms."  AR 502.  On the "Functional Capacities

Form" Dr. Carr completed on September 11, 2005, he reaffirmed his belief that

O'Bryan could never return to work, and that the physical restrictions he placed on

O'Bryan were "indefinite."  AR 340.  The defendants allege, and there is no

evidence or argument from the plaintiff to the contrary, that the form was not created from a functional capacity evaluation of O'Bryan, but was based on Dr. Carr's subjective opinions.  AR 29, at 5.

A functional capacity evaluation is the type of "reliable and objective method of gauging [O'Bryan's] condition" that O'Bryan failed to provide to support his benefits award.  *See Cooper*, 486 F.3d at 176.  When Dr. Hopkins reviewed O'Bryan's additional medical records a second (AR 348-351) and third (AR 327-29) time, she still did not find a physical basis to support any of O'Bryan's alleged functional impairments.  Liberty reasonably decided that O'Bryan would continue to be subject to the limitations in the Mental Illness provision because there were "no physical impairments established by physical examinations or diagnostic testing." AR 319.

O'Bryan takes issue with the transferable skills analysis (TSA) completed by a Vocational Case Manager at Liberty on June 25, 2007, and the court agrees that it is a consideration that weighs for a finding of arbitrary and capricious decision-making by the defendants.  AR 114-15.  The sole basis for the TSA was Dr. Lazoff's report, which was based on a review of O'Bryan's entire medical record. The TSA that formed the basis of an arbitrary and capricious denial of benefits in *Spangler v. Lockheed Martin Energy Systems, Inc.*, was even less comprehensive: it was based solely on an "aberrant," undetailed evaluation of the plaintiff on a single day.  313 F.3d 356, 361-62.  Ideally, the Vocational Case Manager himself

would have had the benefit of O'Bryan's complete medical records. *See Metropolitan Life*, 128 S.Ct. 2352. But, because there were no other objective measurements of O'Bryan's physical limitations in the record, the defendants' consideration of the TSA, albeit flawed, in their final denial decision is just a factor to consider in the arbitrary-and-capricious analysis.

O'Bryan also complains that a number of the consultations upon which the defendants relied in his denial were based upon mere file reviews, not physical examinations, which he believes would accurately assess fibromyalgia and its effects on his person. While there is "nothing inherently objectionable about a file review by a qualified physician," it may raise questions about the thoroughness and accuracy of the defendants' denial and should be considered in determining whether the defendants acted arbitrarily and capriciously. *Calvert*, 409 F.3d at 295-96. In fact, where conclusions from a file review "include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a [file] review may be inadequate." *Id.* at 297 n.6.

O'Bryan was physically examined when Liberty exercised a provision in the Plan that required O'Bryan to undergo an IME. AR 224-33. Dr. Troutt, who is Board Certified in Physical Medicine and Rehabilitation, physically examined O'Bryan for forty-five minutes on June 28, 2006, and comprehensively reviewed O'Bryan's medical history before arriving at his conclusions that the fibromyalgia diagnoses were unsupported by the presence of tender points and O'Bryan could

17

return to some types of work after a conditioning program. *Id.* at 231. Dr. Troutt also concluded O'Bryan's "subjective complaints are not substantiated by the evidence provided me today," and described inconsistent symptoms that O'Bryan exhibited. *Id.* at 232. Moreover, the reports and notes of the numerous treating doctors who physically examined O'Bryan were considered by all of the doctors engaged by the defendants and the defendants themselves.

Finally, the defendants placed reasonable emphasis on the surveillance video of O'Bryan's activities on May 18-20, 2006. The defendants hired an investigative service to conduct surveillance on O'Bryan (AR 242-52), who demonstrated some degree of functionality that was inconsistent with his self-reported complaints and his responses on the Activities Questionnaires (AQ). *See Rose*, 268 F. App'x at 451-53. The defendants "should not have to ignore the inconsistencies between [the claimant's] assessment of [his] level of activity and the videotape of [his] activities." *Rose v. Continental Cas. Co.*, 2007 WL 773745, at*4 (E.D. Ky. Mar. 8, 2007).

For example, on the first day he was observed, O'Bryan visited an office building, pumped gas, and went out to eat at a restaurant, and "moved in a smooth and fluid manner." AR 245. The next day, O'Bryan was observed pushing his garden tractor out of the garage, riding it for more than twenty minutes as he mowed his back yard, and then pushing it back into his garage, "without exhibiting any external signs of impairment or physical restriction." *Id*. In contrast, the AQ

18

O'Bryan completed on May 6, 2005, implied his physical movement was much more limited: he could stand for only five to ten minutes; tried to get outside for a few minutes a day; and his wife or family, not he, conducted almost all routine daily activities.  AR 529-31.  O'Bryan's responses to the Dec 6, 2005, AQ reflected similarly restrictive daily living, with the caveat,  "All answers will depend on energy level, Pain, how much sleep I got.  You never know from 1-hour to the next."  AR 336-338.  Dr. Troutt also viewed and assessed the surveillance video footage, which he believed contradicted his clinical observations during his physical examination of O'Bryan.  AR 232.

After evaluating various factors – Consol's treatment of the SSA disability determination, the conflict of interest, and the defendants' consideration of medical evidence and opinions from O'Bryan's treating physicians – in the context of the record as a whole and under the highly deferential arbitrary-and-capricious standard of review, a reasonable person could have reached the same decision as Consol and Liberty.  *Pralutsky*, 435 F.3d at 840.  Because Consol and Liberty reviewed O'Bryan's claim in a "deliberate" and "principled" fashion, the defendants did not arbitrarily and capriciously deny him long-term disability benefits under the terms of the Plan.  *DeLisle*, 558 F.3d at 447.  Therefore, O'Bryan's motion for summary judgment will be denied.

### B.    Salary Continuance Benefits

This court declines to grant O'Bryan's motion for summary judgment on the

issue of salary continuance plan benefits because there exist disputed issues of material fact as to how to calculate the length of O'Bryan's service at Consol and his corresponding benefits entitlement.  Notably, neither party has provided Consol's "equated service date policy" in effect at the time of O'Bryan's first day of total disability, by which the length of his service should be determined.  R. 28, Ex. 4, at 1028.

Instead, O'Bryan provided a page entitled "Salaried Employees Paid Vacation Plan" and pointed the court to one of the plan's "Highlights" that states, "After an employee's first year of service, his employment anniversary is January 1st of the year employed."  R. 28, Ex. 5.  That document is undated, and O'Bryan fails to explain how the calculation of vacation time is relevant to calculating his length of service and appropriate salary continuance benefits level.  Defendants do not directly address O'Bryan's proffered methodology, but maintain that he was employed for "approximately 13 years and 7 months" between his date of hire and first day of total disability, so he properly fits within the "12 years, less than 14 years" length of service category.  Whether O'Bryan's date of hire factors into the "equated service date policy" calculus is unclear, as is the length of his service pursuant to Consol's policy and procedures, which renders summary judgment inappropriate.

### C.    Severance Pay Benefits

O'Bryan is not entitled to benefits under the plain language of Consol's

Severance Pay Plan; therefore, his request for summary judgment fails as a matter of law.  Section four, "Type of Plan," states as follows: "The Plan is a Welfare Plan which provides payment to eligible employees who are terminated because of a reduction in the work force or because of being replaced by employees returning from leaves of absence."  R. 28, Ex. 3, at 1041.  O'Bryan was terminated for reasons related to his alleged disability; there is no evidence he was terminated as part of a work force reduction or replaced by another employee returning from a leave of absence.  Because of the circumstances of his termination, O'Bryan is not eligible for severance pay benefits and, correspondingly, is not entitled to summary judgment on the issue.

### D.    Attorney's Fees

O'Bryan finally requests that this court exercise its discretion to award reasonable attorney's fees and costs under 29 U.S.C. § 1132(g)(1).  The decision whether to award attorney's fees in an ERISA action is ordinarily based on five factors:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Foltice v. Guardsman Prods., Inc.*, 98 F.3d 933, 936-37 (6th Cir. 1996) (citing *Sec'y of Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985)).

21

The court does not find any indication that O'Bryan's benefits were terminated in bad faith, particularly in light of Liberty's repeated attempts to elicit information from O'Bryan and his various doctors, and given the limited objective evidence submitted by O'Bryan.  *Cf. Moon v. Unum Provident Corp.*, 461 F.3d 639, 643-44 (6th Cir. 2006) (finding bad faith supporting an award of attorney's fees where defendant adopted the opinion of an interested physician who based his findings on selective information in the administrative record and did not examine the insured).  Further, because the defendants did not act arbitrarily and capriciously, there is no improper conduct to deter.  O'Bryan's suit was fact-specific and intended to confer a financial benefit upon himself, not to resolve significant legal questions.  Finally, although it is not disputed that the defendants are able to pay an award of attorney's fees, such fees are not justified in this case.

## III.  Conclusion

Accordingly, **IT IS ORDERED** that the plaintiff's motion for summary judgment (R. 28) is **DENIED.**  This court will not reverse the defendants' administrative decision.

Signed on  March 9, 2010

*Jennifer B.Coffman*

JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

22